# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| *ex rel*. **LAURIE HINDS,** | ) | |
| | ) | **NO. 3:18-cv-01202** |
| **Plaintiff and Relator / Plaintiff** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **v.** | ) | **MAGISTRATE JUDGE NEWBERN** |
| | ) | |
| **SAVASENIORCARE LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Relator Laure Hinds brings this *qui tam* action on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., against Defendant SavaSeniorCare, LLC, and related corporate entities (collectively "Sava" or "Defendants").[1] Relator alleges that Sava fraudulently overbilled Medicare for certain rehabilitation therapy services provided at its facilities between October 1, 2012, and September 30, 2015. Having initially declined to intervene, the United States seeks to dismiss the case brought on its behalf. [2] (Notice of Election to Decline Intervention, Doc. No. 20; and United States' Motion to Dismiss, Doc. No. 79).

---

[1]     In addition to SavaSeniorCare, LLC, the Sava Defendants include SavaSeniorCare Administrative Services, LLC, SavaSeniorCare Consulting, LLC, and over 200 related corporate entities. (First Amended Complaint, Doc. No. 52). For ease of reference, the Court will cite the First Amended Complaint, Doc. No. 52, as "Compl., ¶ __."

[2]     The United States filed unredacted versions of the Memorandum and Declaration under seal at Docket Nos. 83 and 83-1. To the extent possible, the Court cites to the redacted filings. Defendants also filed a motion to dismiss (Doc. No. 64), which the Court denied without prejudice to refiling after resolution of the United States' motion to dismiss (Doc. No. 93).

# I.    BACKGROUND

Relator Laurie Hinds bring this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA. Relator alleges Sava, an operator of over 200 skilled nursing facilities in 20 states, systematically overbilled Medicare, under Parts A and B, for certain rehabilitation therapy services provided at its facilities. Specifically, she claims that between October 1, 2012 and September 30, 2015: (1) Sava billed excess minutes of unattended electrical stimulation ("e-stim") treatments; (2) Sava billed for medically unnecessary e-stim under Medicare Parts A and B; (3) Sava billed for attended e-stim without the required documentation to support the claim; (4) Sava improperly assigned G-codes without a licensed therapist's assessment; and (5) Sava treated patients without obtaining a physician certification of medical necessity. (Compl., ¶ 284).

This case is one of four *qui tam* cases against SavaSeniorCare, LLC, pending in this District. The other cases are: *United States ex rel. Hayward v. SavaSeniorCare, LLC, et al.*, Case No. 3:11-cv-0821 (M.D. Tenn. Aug. 26, 2011); *United States, et al. ex rel. Kukoyi v. SavaSeniorCare, LLC, et al.*, Case No. 3:15-cv-1102 (M.D. Tenn. Dec. 6, 2011); *United States ex rel Scott v. SavaSeniorCare Admin. Servs., LLC, et al.*, Case No. 3:15-cv-0404 (M.D. Tenn. Nov. 20, 2013). Those three cases were consolidated, and, on October 25, 2015, the United States filed a Consolidated Complaint in Intervention against Sava and related entities (the "Consolidated Action" and "Consolidated Complaint"). [3]

---

[3]    The Court designated *United States ex rel. Hayward v. SavaSeniorCare, LLC, et al.*, Case No. 3:11-cv-0821 (M.D. Tenn. Aug. 26, 2011), as the lead case. The United States' consolidated complaint in intervention is filed in *Hayward* at Docket Entry No. 59. For ease of reference, the Court will cite filings on the record in that case as "Consolidated Action, Doc. No. ___."

In the Consolidated Action, the United States alleges that, between October 1, 2008, and September 30, 2012, Sava engaged in a scheme to maximize its Medicare revenue by maximizing the number of days it billed Medicare for the highest level of patient care – Resource Utilization Group ("RUG") level "Ultra High." (Consolidated Complaint, ¶¶ 1-3). "Ultra High" billing is reserved for patients who required skilled rehabilitation therapy from at least two therapy disciplines for a minimum of 720 minutes per week. (*Id.*, ¶ 2). As a result of corporate pressure to meet "Ultra High" billing targets, the Consolidated Complaint alleges Sava therapists billed Medicare for therapy that was not reasonable or necessary, not covered by the Medicare Part A benefit, and/or not skilled in nature. (*Id.*, ¶¶ 72-74). The Consolidated Complaint included allegations that Sava "pushed" the use of modalities, including electrical muscle stimulation ("E-stim"), even when not clinically indicated, as a way to expand the total number of therapy minutes and achieve a higher reimbursement rate (*id.*, ¶ 129), and pressured staff to use "unattended modalities" as a way to increase total therapy minutes (*id.*, ¶ 136).

After litigating the Consolidated Action for almost three years, on September 28, 2018, the United States notified the Court that it was in "advanced" settlement discussions and requested a stay of the Consolidated Action to allow the parties to continue settlement negotiations. The stay has been extended several times. However, the most recent status update from the parties states that they have not yet finalized the language of the settlement agreement or obtained approval from all of the relevant decisionmakers. (*See* Doc. No. 132-2 (Consolidated Action, Status Report, Doc. No. 454 (Mar. 1, 2021) (stating that the parties hope the settlement agreement will be finalized and executed within the "next several weeks")).

At approximately the same time the parties sought a stay to pursue settlement in the Consolidate Action, counsel for Relator informed counsel for the Government about this potential *qui tam* case and sent the Government a copy of the draft complaint.[4] At the request of the Government, Relator delayed filing the complaint. (Moore Decl., Doc. No. 88-1, ¶¶ 7-12). On October 16, 2018, while discussing the potential new *qui tam* action against Sava, the Government informed Relator that the United States had determined that the allegations in the potential *qui tam* action were substantially similar to those in the Consolidated Action and that, given the status of the settlement discussions with Sava in the Consolidated Action and Sava's financial condition, the Government did not believe Relator's complaint would provide any new benefit to the United States. (Rousseau Decl., Doc. No. 81, ¶ 23). The Government told counsel for Relator that if she filed the *qui tam* complaint, the United States would likely seek authority to decline to intervene or move to dismiss. (*Id.*, ¶¶ 24, 25; Moore Decl., Doc. No. 88-1, ¶¶ 12).

Relator filed this case on October 25, 2018. (Doc. No. 1). On December 12, 2018, the United States filed a notice of election to decline intervention. (Doc. No. 20). During the first months of 2019, counsel for the United States and Relator continued to discuss the claims. (Moore Decl., Doc. No. 88-1, ¶¶ 24-33; Rousseau Decl., Doc. No. 81, ¶ 33-37). During those discussions, the Government informed counsel for Relator that the settlement in the Consolidated Action was based on Sava's financial condition. (*Id.*). The Government took the position that even if Relator

_____

[4]    On September 26, 2018, counsel for Relator informed the Civil Chief for the United States' Attorney Office for the Middle District of Tennessee about the potential *qui tam* action. (Moore Decl., Doc. No. 88-1, ¶ 5). Two days later, on September 28, 2018, counsel for Relator sent a copy of the draft complaint to counsel for the United States and, in the Consolidated Action, the parties requested a stay. (*Id.*, ¶ 6; Consolidated Action, Doc. No. 364).

were able to negotiate a settlement in principle with Sava, any additional funds from Sava should instead be allocated to the settlement of the Consolidated Action. (Moore Decl., Doc. No. 88-1, ¶ 31; Rousseau Decl., Doc. No. 81, ¶ 36). When asked about the possibility of being included in the settlement of the Consolidated Action, the Government declined on the basis that the settlement discussions were "advanced," and the Consolidated Action stayed before Relator filed her complaint. (Rousseau Decl., Doc. No. 81, ¶ 33-35). The Government also explained its bases for seeking dismissal of Relator's case under § 3730(c)(2)(A). (*Id*.).

On March 20, 2019, the United States informed Relator that it had received authority to seek dismissal of this action.[5] (Rousseau Decl., Doc. No. 81, ¶ 37). However, almost a full year passed before the United States filed the instant motion to dismiss. During that time, Relator worked with Sava to identify the proper defendants and, on October 3, 2019, filed an amended complaint naming an additional 200+ Sava entities. (*See* Doc. Nos. 49, 52).

The parties then agreed to extend the time to answer the amended complaint or file a motion to dismiss to January 8, 2020. (Doc. No. 57). Sava filed a motion to dismiss. (Doc. No. 64).[6] On May 11, 2020, two weeks after the close of briefing on Defendants' motion to dismiss, the United States filed a statement of interest (Doc. No. 78) and a motion to dismiss (Doc. No. 79).

The United States seeks to dismiss this action under § 3730(c)(2)(A). In the alternative, the United States argues that the Court lacks subject matter jurisdiction because Relator's claims,

---

[5]     The Government explains that it originally anticipated filing the motion to dismiss in 2019, but waited to file the motion "because of issues related to the settlement discussions." (Doc. No. 80 at n.4).

[6]     The Court denied Defendants' motion without prejudice to refiling after resolution of the United States' motion to dismiss. (Doc. No. 93).

5

which it contends alleges a substantially similar fraudulent scheme as that alleged in the Consolidated Action, are barred under the "first to file" bar, 31 U.S.C. § 3730(b)(5), the "government action" bar, 31 U.S.C. § 3730(e)(3), and the "public disclosure" bar, 31 U.S.C. § 3730(e)(4).

The United States' Motion to Dismiss has been subject to several rounds of briefing and a hearing. In addition to fully briefing the initial motion,[7] the parties filed supplemental briefs addressing the Seventh Circuit's decision in *United States ex rel. CIMZNHCA v. UCB, Inc*., 970 F.3d 835 (7th Cir. 2020),[8] and, following a hearing on the motion, filed post-hearing briefs.[9]

## II.    ANALYSIS

### A.  The False Claims Act

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., "prohibits submitting false or fraudulent claims for payment to the United States, § 3729(a), and authorizes *qui tam* suits, in which private parties bring civil actions in the Government's name, § 3730(b)(1)." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 521 (6th Cir. 2020) (quoting *Schindler Elevator Corp.*

---

[7]    In support of the Motion, the United States filed a memorandum (Doc. No. 80) and the Declaration of Allison Rousseau (Doc. No. 81). Relator filed a response in opposition (Doc. No. 88), the Declaration of Michael J. Moore (Doc. No. 88-1), and two additional exhibits. The United States filed a Reply. (Doc. No. 92).

[8]    Relator's Supplemental Brief (Doc. No. 98); United States' Supplemental Brief (Doc. No. 96); Defendants' Supplemental Brief (Doc. No. 97). Relator also filed a reply to the United States' and Defendant's supplemental briefs. (Doc. No. 99).

[9]    Relator's Post-Hearing Brief (Doc. Nos. 125); United States' Post-Hearing Brief (Doc. No. 122); Defendants' Post-Hearing Brief (Doc. No. 124).

*v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011)). The relator is entitled to a portion of the proceeds of the action or settlement of the claim. 31 U.S.C. § 3730(d).

"[T]o discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud," the FCA places several limitations on *qui tam* actions. *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009) (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005)). Specifically, a Relator may not bring a *qui tam* action based upon facts underlying an earlier filed action (first-to-file bar), 31 U.S.C. § 3730(b)(5), based upon allegations or transactions which are the subject of a civil suit in which the Government is already a party (government action bar), 31 U.S.C. § 3730(e)(3); or if substantially the same allegations or transactions as alleged in the action were publicly disclosed (public disclosure bar), 31 U.S.C. § 3730(e)(4)(A).

Under the *qui tam* provisions of the FCA, the *qui tam* action is filed under seal and served upon the Government with copies of "substantially all material evidence and information the person possesses." 31 U.S.C § 3730(b)(2). The Government then has sixty days – more if the court extends the time period for good cause shown – to elect to intervene. *Id*. If the Government elects to intervene, the Government will conduct the action. If the Government declines to intervene, the relator will conduct the action. *Id*. § 3730(b)(4). However, the Government may intervene at a later date upon a showing of good cause. *Id*. U.S.C. § 3730(c)(4)).

Section 3730(c) sets forth the rights of the parties to *qui tam* actions as follows:

> **(c) Rights of the parties to qui tam actions –**
>
> **(1)** If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to

continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2) **(A)** The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with the opportunity for a hearing on the motion.

**(B)** The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

**(C)** Upon showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation …

**(D)** Upon showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant the undue burden or unnecessary expense, the court may limit the participate by the person in the litigation.

**(3)** If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with a copy of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and right of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

**(4)** Whether or not the Government proceeds with the action, upon a showing by the Government that certain acts of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days …

31 U.S.C. § 3730(c).

## B. Public Disclosure, First-to-File, and Government Action Bars

The Government argues Relator's claims are barred under the first-to-file bar, the government action bar, and the public disclosure bar because they allege a substantially similar fraudulent scheme by the same group of defendants as alleged in the earlier filed Consolidated Action. Although the specific standards that apply to the first-to-file bar, the government action bar, and the public disclosure bar vary slightly, they generally consider whether the challenged *qui tam* complaint is based on facts alleged in a previously filed action or were otherwise publicly disclosed.

Section 3730(b)(5) establishes the so-called "first-to-file" bar by requiring that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." This section, "unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts." *Poteet*, 552 F.3d at 515 (quoting *Walburn*, 431 F.3d at 971)). To determine whether a complaint is barred by the first-to-file rule, the Court "must compare the relator's complaint with the allegedly first-filed complaint" to determine whether the complaints identify "'all the essential facts' of the underlying fraud." *Id*. at 516. The fact that a later action involves additional defendants or covers different time periods will not allow a relator to escape the first-to-file bar if the complaints identify the "same general fraudulent scheme" by the "same general group of actors." *Id*. at 517.

Containing comparable language, the "government action" rule requires dismissal of an action "based upon allegations or transactions which are the subject of a civil suit … in which the Government is already a party." 31 U.S.C. § 3730(e)(3).

The "public disclosure rule" provided in § 3730(e)(4) uses slightly different language to similar effect. Section 3730(e)(4) provides that "the court shall dismiss an action or claims under this section … if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed … unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."[10]

Congress amended aspects of the public disclosure bar in 2010. *See* 31 U.S.C. § 3730(e)(4)(2010); *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 (6th Cir. 2020). Before its amendment in 2010, the statute barred claims "based upon" publicly disclosed allegations or transactions. *See id.* at 847 (citing 31 U.S.C. § 3730(e)(4)(A) (1986)). The 2010 amendment, changed "based upon" to "substantially the same." *Id*. The Sixth Circuit has instructed that the modification made the public disclosure bar "more lenient," and that "substantially the same" requires "a greater degree of similarity" and is "more sensitive to differences between the *qui tam* complaint and the prior disclosures than the prior 'based upon' language." *Id*. at 851.However, because the "substantial identity standard" applied to the previous version of the statute was expressly incorporated into the amendment, the Sixth Circuit continues to apply the principles of pre-amendment cases to the extent they are compatible with the amended statutory text. *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 n.1 (6th Cir. 2020).

With this in mind, the Sixth Circuit continues to direct courts to look at the "essential elements of the alleged fraud" to determine whether the disclosed information was enough to

---

[10]     Relator does not contend that she an original source.

expose the fraudulent transaction alleged in the complaint. *Id.* at 523. (quoting *Ibanez v. Bristol-Myers Squibb Co*., 874 F.3d 905, 918 (6th Cir. 2017)). Although there need not be a "complete identity of allegations, even as to time, place, and manner," there must be a "'substantial identity' between the prior disclosures and the *qui tam* complaint such that 'the prior disclosures depict essentially the same scheme.'" *Id.* (quoting *Poteet*, 552 F.3d at 514, and *Holloway*, 960 F.3d at 848). It is not enough to allege "new, slightly different, or more detailed factual allegations." *Id.* at 525.

Without comparing the specific allegations of the respective complaints, the Government broadly characterizes the allegations in both actions as involving false claims for payment to Medicare for rehabilitation services and argues that the Consolidated Action was sufficient to put the Government on notice of the fraudulent scheme. (Doc. No. 80 at 29).

Relator argues that her claims are not barred because she alleges a distinct fraudulent scheme, involving a different time period, and distinct defendants. As noted above, differences in time will not save a complaint otherwise alleging "essentially the same scheme." *Maur*, 981 F.3d at 523. Nor will the addition of new defendants when the complaints "concern the same corporate parent" and the Government is on notice of alleged corporate-wide conduct. *Holloway*, 960 F.3d at 849. Accordingly, the focus of the Court's inquiry is whether the complaints allege essentially the same fraudulent scheme.

The Amended Complaint alleges four claims. First, Relator alleges "Sava billed excess minutes of *un*attended e-stim in order to inflate its RUG rates under Medicare Part A." (Compl., ¶ 284). This parallels almost exactly the allegation in the Consolidated Action that Sava

11

billed Medicare Part A for unnecessary therapy services, including e-stim therapy, to increase its RUG rate. (*See e.g.*, Consolidated Compl., ¶ 7).

Second, Relator alleges, "Sava billed for medically unnecessary e-stim under Medicare Parts A and B." (Compl., ¶ 284). Except for the inclusion of billing under Medicare Part B, this claim also parallels the allegations in the Consolidated Action. (*See e.g.*, Consolidated Compl., ¶¶ 129-136, 186-191). Even though the Consolidated Action did not specifically allege fraud with regard to Medicare Part B, the allegations involve the same scheme of billing Medicare for medically unnecessary e-stim treatment. The difference in applicable Medicare regulations is not an essential element of the fraud and is insufficient to clear the bar to this claim.

Third, Relator alleges, "Sava systematically billed Medicare under Parts A and B for *a*ttended e-stim without the required documentations to support the claim." (Compl., ¶ 284). She alleges that Sava billed for attended e-stim to boost patients into higher RUG categories. (*Id.*, ¶ 342-50). Relator asserts that the distinction between attended and unattended e-stim is important because it was only by billing for attended e-stim that Sava was able to meet the threshold for "ultra high" billing.[11] (*Id.*, ¶ 342-251). Again, these allegations, for which the specific examples all concern claims for payment under Medicare Part A, merely add detail to the fraudulent scheme alleged in the Consolidated Action. While the Consolidated Complaint in that case does not

---

[11] In briefing this issue, Relator states that Count III alleges Sava "falsely billed for skilled therapy when unskilled therapy was actually provided." (Doc. No. 88 at 24). This does not reflect the allegations in in the Amended Complaint. (*See* Compl. at ¶¶ 334-351) (alleging billing for attended e-stim therapy without proper documentation).

distinguish between attended and unattended e-stim therapy, this additional detail is not an essential element to the fraud, nor does it entail a distinct fraudulent scheme.

Fourth, Relator alleges "Sava improperly assigned G-codes without a licensed therapists assessment." (Compl., ¶ 284). Relator explains that G-codes are a rating of the patients' functional limitation and severity level and are required for reimbursement under Medicare Part B. (*Id*. at ¶ 270). G-codes must be assigned by a licensed therapist and must be based on the therapists' personal evaluation of the patient. (*Id*. at ¶ 273). Relator alleges therapists impermissibly assigned G-code ratings to patients based entirely on retroactive review of treatment provided by therapy assistants on days the therapists had not personally provided treatment to those patients. (*Id*. at ¶¶ 270-74). These claims are not based on the facts or fraudulent scheme alleged in the Consolidated Action. Indeed, according to the Amended Complaint, Medicare only began requiring providers to assign G-codes in January 2013, after the end of the relevant time period in the Consolidated Action. (*See* Compl., ¶ 270; Consolidated Compl., ¶ 3).

Relators Fifth claim is that Sava frequently treated patients without first obtaining a physician's certification that the treatment was medically reasonable and necessary and regularly back-dated certifications and late-filed certifications without explanation. (Amended Compl., ¶¶ 275-76, 284, 360). This allegation merely provides additional detail to the allegations in the Consolidated Action that Sava provided care that was not medically reasonable or necessary. In fact, although the Consolidated Complaint does not include the detail that Sava regularly provided late-filed physician certifications, it does discuss the physician certification requirement and allege generally that "Sava routinely failed to provide support for the reasonableness and necessity of the skilled therapy services provided to patients." (Consolidated Compl., ¶¶ 31, 173).

13

Examination of the complaints shows that Relator's allegations primarily provide additional detail to the fraudulent scheme disclosed in the Consolidated Action. The one exception is Relator's claim in Count IV that Sava improperly assigned functional ratings known as G-codes without a therapists personal assessment. Accordingly, the claims in Counts I, II, III, and V are barred by §§ 3730(b)(5), (e)(3), and (e)(4) of the FCA.

## C. Dismissal Under § 3730(c)(2)(A)

Having determined Relators claims are not barred in their entirety, the Court considers the Government motion to dismiss Relator's claims under 31 U.S.C. § 3730(c)(2)(A). As stated above, § 3730(c) sets forth the rights of the parties to *qui tam* actions, and subsection (c)(2)(A) allows the Government to dismiss an action over the objection of the relator if the relator has received notice of the motion to dismiss and has an opportunity for a hearing on the motion. 31 U.S.C. § 3730(c)(2)(A).

The statute does not provide any standard by which the Court should review a motion to dismiss by the United States, and neither the Supreme Court nor the Sixth Circuit have addressed the issue. For the most part, courts have applied one of two standards to evaluate Government motions to dismiss *qui tam* actions, with many courts finding dismissal is appropriate under either standard.

The first, and most widely used, is a rational relation test. The Ninth Circuit, in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998), held that to dismiss a *qui tam* action under § 3730(c)(2)(A) the Government is required to show a valid government purpose and a rational relationship between dismissal and achievement of that purpose. If the Government makes this showing, the burden shifts to the relator to show

14

that the dismissal is "fraudulent, arbitrary, or illegal." *Id*. The Tenth Circuit has also adopted this standard. *See Ridenour v. Kaiser-Hill Co*., 397 F.3d 925, 936 (10th Cir. 2005).

Five years after *Sequoia Orange*, the D.C. Circuit Court of Appeals adopted a more lenient standard. *Swift v. United States*, 318 F.3d 250, 252-53 (D.C. Cir. 2003). The *Swift* court held that the Government has a virtually "unfettered right to dismiss" and "the function of a hearing when the relator requests one is simply to give the relator a formal opportunity to convince the government not to end the case." *Id*. at 253. *Swift* further noted that although the Government's discretion to dismiss an action it has already brought may not be absolute, the court must presume it is acting rationally and in good faith. *Id*. (leaving open the possibility for an exception to the absolute right to dismiss if there was evidence of fraud on the court) (citing *Rinaldi v. United States*, 434 U.S. 22, 30 (1977)).

Most recently, the Seventh Circuit explicitly rejected the previously established standards of *Sequoia Orange*, which had been applied by the district court, and *Swift*. *United States ex rel. CIMZNHCA v. UCB, Inc.*, 970 F.3d 835 (7th Cir. 2020). In *CIMZNHCA*, the United States initially elected not to intervene and subsequently sought to dismissal under § 3730(c)(2)(A). The Seventh Circuit determined that to dismiss a *qui tam* suit, the United States first had to be a party to the case by intervening for good cause under § 3730(c)(3). If the United States successfully intervenes, dismissal should then be considered under the standard of Rule 41 of the Federal Rules of Civil Procedure. *Id*. at 850. The *CIMZNHCA* court suggested that that requiring a showing of good cause had the added benefit of "offer[ing] a standard on the merits of dismissal, in the absence of a specific standard in 31 U.S.C. § 3730(c)(2)(A)." *Id*. at 849. In this context, the hearing serves the

15

purpose of ensuring that the Government's conduct does not "bump up against" the Federal Rules of Civil Procedure, the statute, or the Constitution. *Id*. at 853.

The Government urges the Court to apply the standard in *Swift*, but contends that dismissal is also appropriate under the standards articulated in *Sequoia Orange* and *CIMZNHCA*. Relator argues the Court should apply the rational relation standard from *Sequoia Orange* and argues the Government has not satisfied this standard because it did not investigate her claims. In addition, Relator asserts that dismissal under any standard would be inappropriate because the Government must first intervene before seeking to dismiss under § 3730(c)(2)(A).

The Court need not determine the appropriate standard for dismissal, because the Government's motion to dismiss should be granted under any of the applicable standards.

The *Swift* standard merits little discussion as it does not require the Government to intervene for good cause prior to dismissing a *qui tam* action and allows the Government "virtually unfettered discretion" to dismiss. With the exception of fraud on the court, of which there is no evidence here, under *Swift*, the Court would grant the Government's motion to dismiss.

Under the standards articulated in *Sequoia Orange* (rational relation) and *CIMZNHCA* (good cause), the Court conducts a more searching analysis of the Government's reasons for seeking dismissal. Nevertheless, both standards largely require consideration of the same factors and the result is, unsurprisingly, the same.

1. The Government Must Intervene

As an initial matter the Court considers whether the Government, having noticed its intent to decline intervention, must intervene for good cause under § 3730(c)(3) before it may dismiss

16

the action under § 3730(c)(2)(A). This question is the subject of disagreement among the courts that has not been directly addressed by Sixth Circuit or Supreme Court precedent.

The majority of courts to have considered the issue appear to have concluded that intervention is not required. *See e.g.*, *Swift*, 318 F.3d at 251-52, *Ridenour*, 397 F.3d 925. In addition, the Second Circuit, Third Circuit, and Ninth Circuit have tacitly endorsed the view that intervention is not a prerequisite to dismissal by the government.[12] *United States ex rel. Borzilleri v. AbbVie, Inc*., 837 F. App'x 813 (2d Cir. 2020) (dismissing case on motion of the Government nine months after Government elected not to intervene); *Chang v. Children's Advocacy Ctr. of Del*., 938 F.3d 384, 386 (3d Cir. 2019); *Sequoia Orange Co. v. Baird-Neece Packing Corp*., 151 F.3d 1139, 1145 (9th Cir. 1998) ("This court has noted that § 3730(c)(2)(A) may permit the government to dismiss a *qui tam* action without actually intervening in the case at all.").

As discussed above, despite this seemingly broad consensus that intervention is not required, the Seventh Circuit recently reached the opposite conclusion. *CIMZNHCA*, 970 F.3d 835 (holding that the Government is required to intervene upon a showing of good cause under § 3730(c)(3) before it may seek dismissal under § 3730(c)(2)(A)). In *CIMZNHCA*, the court found that a motion to dismiss by the Government when the Government had elected not to intervene was, both in substance and form, a motion to intervene and dismiss. 970 F.3d at 843-44.

---

[12]     The Eleventh Circuit held that the Government is not required to intervene before settling a *qui tam* case under 31 U.S.C. § 3730(c)(2)(B). *United States ex rel. Ashton v. Everglades College*, 855 F.3d 1279, 1285 (11th Cir. 2017) (holding that intervention is only required when the government intends to proceed with the litigation).

Examining the text of the statute, particularly subsection (c) as a whole, the court explained that the structure of the statute supported its conclusion that intervention is required. It noted that, except for paragraph 2, each of the paragraphs in subsection (c) starts with an introductory phrase indicating the procedural posture to which it applies. Paragraph (1) applies "If the Government proceeds with the action." Paragraph (3) applies "If the Government elects not to proceed with the action." Paragraph (4) applies "Whether or not the Government proceeds with the action." Paragraph (5) applies "Notwithstanding subsection (b). The court reasoned that reading subsection (c)(2) to apply whether or not the government had intervened would "make surplusages of paragraph (4)'s introductory phrase, 'Whether or not the Government proceeds with the action.'" *Id*. at 844. A more reasonable reading, the *CIMZNHCA* court argues, is that paragraph (2) is precisely what it appears – a limitation on the rights of the Relator to continue as a party to the action when the Government has intervened. The court conceded that as a "typographic matter" paragraph (c)(2) is not a subsection of paragraph (c)(1), but found that basis insufficient to overcome text and logic of the relationship between the five paragraphs of subsection (c).

Recognizing that numerous courts have found that the intervention is not required, the Court finds the *CIMZNHCA* court's textual reading of the statute more persuasive. The Court notes that this reading is in accord with the Sixth Circuit's statement in *United States ex rel. Poteet v. Medtronic, Inc*., 552 F.3d 503, 519 (6th Cir. 2009).[13] *Poteet* concerned the Government's motion

---

[13]     *But see*, *United States ex rel. Levine v. Avnet, Inc*., No. 2:14-cv-17 (WOB-CJS), 2015 WL 1499519, at *1 (E.D. Ky. Apr. 1, 2015) (stating that the statement by the Sixth Circuit in *Poteet* did not "alter the Court's conclusion … that the Government need not intervene to invoke § 3730(c)(2)(A) because the statement was made in response to an entirely different question: whether a hearing is required to evaluate a motion to dismiss for lack of subject-matter jurisdiction.").

to dismiss a *qui tam* complaint for lack of jurisdiction under the first to file rule and public disclosure rule. The relator argued she was entitled to a hearing on the motion to dismiss under 31 U.S.C. § 3730(c)(2)(A). The Sixth Circuit disagreed, stating that, read in its proper context, "Section 3730(c)(2)(A) applies only when the government has decided to 'proceed[] with the action' and has assumed 'primary responsibility for prosecuting the action.'" *Id*. (citing 31 U.S.C. § 3730(c)(1) (defining the parties rights if the Government proceeds with the action)). The court continued, "Such a hearing is required because, at that point in the litigation, it is clear that the relator has brought a jurisdictionally valid claim, has standing to pursue the claim, and is precluded from pursuing the claim only because the government has decided to intervene. This statutory requirement to provide a hearing does not, by its own terms, apply when the government does not yet have 'primary responsibility for prosecuting the action.'" *Id*. (citing 31 U.S.C. § 3730(c)(1)).

The courts finding intervention is not required have largely agreed with *Swift*, that the plain terms of the statute do not require the government to intervene before dismissing a case.[14] *See e.g.*, *Ridenour*, 397 F.3d at 932 (adopting the reasoning in *Swift* that intervention is not required and

_____

[14]     Because *Swift* concerned a motion to dismiss made by the Government while the case was still under seal, the ruling is arguably dicta. Indeed, even the *Swift* court considered the matter of intervention to be "largely academic." *Swift*, 318 F.3d at 251. However, *Swift* is unequivocal that the Government's right to dismiss is not conditioned on it first having intervened and the statutory interpretation articulated in *Swift* applies equally to motions to dismiss filed during the seal period and after the Government has elected not to intervene. Moreover, in a subsequent decision, *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61 (D.C. Cir. 2008), the court appears to have applied this interpretation when it granted a motion to dismiss brought by the Government three months after it elected not to intervene. However, *Hoyte* did not specifically address the issue. *See also United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1233 (D.C. Cir. 2012) (holding government did not have to intervene before moving to dismiss because intervention is required only if the government seeks to proceed with the action).

19

expressing concern that a "for cause" requirement "would place the FCA on constitutionally unsteady ground" with regard to the separation of powers doctrine); *United States ex rel. Davis v. Hennepin County*, No. 18-cv-01551, 2019 WL 608848 (D. Minn. Feb. 13, 2019) (adopting *Swift* and *Ridenour* conclusion that intervention is not required by the plain terms of the statute); *United States ex rel. Levine v. Avnet, Inc.*, No. 2:14-cv-17, 2015 WL 1499519, at * 2 (E.D. Ky. Apr. 15, 2015) (noting that the meaning of § 3730(c)(2)(A) "would be clearer if Congress had prefaced the provision with 'Whether or not the Government proceeds,' as it did in paragraph (c)(4)," but finding that statutory language does not expressly limit the provision to circumstances where the Government has intervened). Other courts have granted a Government motion to dismiss after the Government has declined to intervene without discussion of the intervention question. *See Borzilleri*, 837 F. App'x at 815; *United States ex rel. Hoyte v. American National Red Cross*, 518 F.3d 61 (D.C. Cir. 2008); *Maldonado v. Ball Homes, LLC*, Case No. 5:17-379-DCR, 2018 WL 3213614, at *1 (E.D. Ky. Jun. 29, 2018).

The *Swift* court reasoned that intervention was not required for two reasons: first, because the purpose of intervention is to "proceed with the action" and the Government in "ending the case by dismissing it is not proceeding with the action;" second, because the plain language of § 3730(c)(2)(A) did not require intervention. *Swift*, 318 F.3d at 251-52. The court stated that nowhere in the provision is the right to dismiss the action conditioned on the Government first having elected to intervene the dismissal – the provision is not a subsection of § 3730(c)(1), nor does it contain language stating that it is applicable only in the context of § 3730(c)(1). *Id.* at 252.

The Court disagrees that the plain language of the statute allows the Government to dismiss the case without first intervening. Finding that paragraph (c)(2) applies whether or not the

government had intervened requires an unnatural reading of the statutory language that leaves the paragraph untethered from the surrounding text. The Court agrees with the Seventh Circuit that "paragraph (c)(2) is better read to operate only "If the Government proceeds with the action." *CIZMNHCA*, 970 F.3d at 845 (citing 31 U.S.C. § 3730(c)(1)).[15] Moreover, the Court declines to manufacture concern that requiring a showing of good cause to intervene before dismissing a case implicates the separation of powers doctrine. While such concern is certainly a hypothetical possibility, the Court is unaware of any *qui tam* action where the requirement to show good cause to intervene has been held to unconstitutionally wrest control of prosecutorial decisions from the Government. In any event, no such circumstance is present in the instant case.

The Supreme Court's opinion in *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015), has little bearing on this issue. In considering a question related to the statute of limitations and the first-to-file bar, the Court stated, in dicta, that under the *qui tam* provisions, the United States "retains the right at any time to dismiss the action entirely, § 3730(c)(2)(A), or to settle the case, § 3730(c)(2)(B)." The Court was not considering, nor did it engage in any substantive discussion of, intervention in conjunction with the Government's ultimate right to dismiss or settle a case under Section 3730(c)(2).

---

[15] Recognizing that other courts cited concern for the constitutional implications of requiring the Government to intervene for good cause before moving to dismiss, the Seventh Circuit rejected the notion that the constitutionality of the False Claims Act will "stand or fall on the requirement that the government show good cause to intervene and dismiss after its automatic intervention rights have expired." *CIMZNHCA*, 970 F.3d at 848 noting the flexibility of the "good cause concept" and the possibility that "avoiding offense to the separation of powers in a case that that actually risks it could itself weigh heavily in any 'good cause determination.'" *Id.* at 847.

Having determined that the Government must first intervene upon a showing of good cause under 31 U.S.C. § 3730(c)(3), the Court construes its motion to dismiss as a motion to intervene and dismiss. *See CIMZNHCA*, 970 F.3d at 849 (treating the government's motion to dismiss as a motion to intervene and dismiss); *Swift*, 318 F.3d at 252 ("we could construe the government's motion to dismiss as a motion to intervene"); *United States v. Academy Mortgage Corp.*, No. 16-cv-02120-EMC, 2018 WL 3208157 (N.D. Cal. Jun. 29, 2018) ("moving to dismiss is tantamount to intervention").

    2. <u>Good Cause</u>

The FCA does not define "good cause." As the Seventh Circuit stated, "good cause" is a "uniquely flexible and capricious concept," defined by Black's Law Dictionary amorphously as "[a] legally sufficient reason." *CIMZNHCA*, 970 F.3d at 846 (quoting Black's Law Dictionary 101 (4th pocket ed. 2011)). The *CIMZNHCA* court suggested that in considering whether good cause exists to intervene, the court should consider the propriety of dismissal under the Federal Rules of Civil Procedure and the statute, as well as countervailing considerations such as fairness to the relator and conservation of judicial resources. 970 F.3d at 853. At least one federal district court has suggested that when the Government meets the rational relation criteria of *Sequoia Orange*, it also has good cause to intervene – and vice versa. *Academy Mortgage*, 2018 WL 3208157, at * 3 (finding that the criteria for granting the Government's motion to dismiss in *Sequoia Orange* comports with the good cause requirement for intervention). Where, as here, the complaint has been answered and "the conditions of Rule 41(a)(1) do not apply, 'an action may be dismissed at the plaintiff's request only by court order, on terms the court considers proper.'" *CIMZNHCA*, 970 F.3d at 851 (citing Fed. R. Civ. P. 41(a)(2)).

Because the Government seeks to intervene for purposes of dismissing the action, consideration of whether the Government has provided good cause to intervene is necessarily intertwined with the merits of its motion to dismiss. If the government's motion to dismiss will not be granted, there almost certainly will not be good cause to intervene and vice versa. The Court acknowledges that this circular analysis likely returns to the *Swift* court's conclusion that "the question of whether the False Claims Act requires the government to intervene before dismissing an action is largely academic." *See Swift*, 318 F.3d at 252. However, this may not always be the case and the Court is persuaded that requiring the Government to intervene for good cause is a more textually sound path.

3. The Government's Motion to Dismiss Should be Granted

Having followed this winding path, the Court proceeds to consider the reasons given by the Government for dismissing the action as well as countervailing considerations such as fairness to the Relator, substantive due process, the use of judicial resources, and the terms on which dismissal would be proper. In so doing, the Court considers the propriety of dismissal under the rational relation test of *Sequoia Orange*, as well as under Federal Rule of Civil Procedure 41(b), and finds dismissal is warranted under either standard. As stated above, the Government has easily met the "virtually unfettered discretion standard" applied by the *Swift* court.

To recap, the rational-relation test of *Sequoia Orange*, mimics the test for substantive due process; it requires the Government to show a valid government purpose and a rational relationship between dismissal and achievement of that purpose. If the Government satisfies that test, the burden then shifts to the Relator to "demonstrate that dismissal is fraudulent, arbitrary and

23

capricious, or illegal." 151 F.3d at 1145 (citations omitted). Under Federal Rule of Civil Procedure 41(a)(2), the Court may dismiss an action "on terms the court considers proper."

The Government seeks to dismiss this *qui tam* action based on its determination that allowing the action to proceed would waste Government resources. As justification for this determination, it states that it has spent years and expended considerable resources investigating, litigating, and pursuing settlement of earlier-filed FCA claims against Sava, which, like the claims in this case, also alleged fraudulent Medicare billing related to rehabilitation therapy. The Government states that the settlement agreement that will resolve the Consolidated Action, will include not only a financial settlement of the Consolidated Action, but also resolution of administrative claims between Sava and the Department of Health and Human Services, and a corporate integrity agreement for ongoing monitoring. The settlement agreement is "based on Sava's financial condition." As a result, it contends that this action is unlikely to result in additional recovery regardless of the merits of the claims. In addition, the Government takes the position that, even if there is a possibility of additional recovery from Sava, any addition funds should be allocated to settlement of the Consolidated Action.

The Government bolsters this explanation with details regarding the extent of its investigation and litigation of the Consolidated Action. The Government states that, before electing to intervene in that case, it conducted an extensive investigation of the allegations, including reviewing tens of thousands of documents and interviewing eight current and former employees. (Rousseau Decl., Doc. No. 81, ¶¶ 7-10). Following the election to intervene, between 2015 and 2018, it collected more than 1.1 million documents from Government custodians, collected additional documents from Government contractors, and produced more than 14,000

24

documents. the Government states that it expended considerable resources litigating the Consolidated Action. (*Id.* at ¶¶ 12, 13). It also reviewed more than 285,000 documents from 100 custodians that were produced by Sava, conducted a medical records review, and completed two damages analyses. (*Id.*).

To summarize the Government's reasons for dismissal, it argues that having nearly resolved an extensive multi-year, multi-jurisdiction investigation and litigation regarding fraudulent Medicare billing at Sava and related entities, embarking upon another similar investigation and litigation, particularly were the nature of the settlement in the Consolidated Action minimizes the likelihood of additional recovery, would not constitute a good use of Government resources.

Relator raises two reasons why the Government's cost/benefit analysis is not rational: first and foremost is that the Government has not investigated her claims; second is that determinations based on Sava's financial condition are premature and did not consider the financial status of the over 200 defendants named in this case that are not defendants in the Consolidated Action.

Relator complains that the Government did not investigate her claims, "diligently or otherwise," specifically noting that she was not interviewed about her claims. Without investigating her claims, Relator argues it is impossible to determine the costs of litigation or the potential value of the claims. Relator further argues that the Attorney General has a statutory duty

to investigate violations of the FCA under 31 U.S.C. § 3730(a),[16] and that absent diligent investigation, the Government's decision to dismiss is arbitrary and capricious.

In response, the Government contends this section of the statute, which is separate from the *qui tam* provisions, does not suggest the Attorney General is obligated to investigate specific allegations brought by each and every relator regardless of the circumstances. The Government adds that even if investigation is statutorily required, its investigation of the Consolidated Action together with a review of the materials provided by Relator prior to filing the complaint more than satisfied this obligation.

The Court agrees. Moreover, even if the Attorney General is obligated to investigate violations, nothing in the statute specifies the extent of the investigation required. Relator provided the draft complaint and disclosure statement, which together amounted to hundreds of pages of documents. (*See* Doc. No. 80 at 24; Rousseau Decl., Doc. No. 81, ¶ 22). The Government then reviewed these materials in the context of the pre-existing investigation into Sava's Medicare billing, and concluded Relator's "allegations would not further the United States' efforts to hold Sava accountable and was unlikely to result in additional recovery." (Rousseau Decl., Doc. No. 81, ¶ 22).

In addition, the Government states that its investigation of the allegations in the Consolidated Action overlap with the allegations in this case substantially, if not completely

---

[16]     Section 3730(a) provides: "The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person." 31 U.S.C. § 3730(a).

temporally. The Government contends that the prior investigation covered "much of the same ground Relator suggested in her disclosure statement," noting that there is at least some overlap in witnesses. (Doc. No. 122 at 16; Rousseau Decl., Doc. No. 123). As part of the investigation and litigation of the Consolidated Action, the Government interviewed three of Relator Hinds' suggested witnesses and collected documents and emails from eight others. (Rousseau Decl. (May 11, 2020), Doc. No. 81, ¶¶ 6-12; Rousseau Decl. (Jan 15, 2021), Doc. No. 123, ¶¶ 4-6).

The Government did not specifically address Relator's argument that the 200 Sava entities that are not parties to the Consolidated Action may have the financial wherewithal to contribute to a damages award in this case or that even after settlement of the Consolidated Action Sava will continue to operate as a for-profit corporation. However, while the possibility remains that Sava would ultimately be able to satisfy a judgment in this case or that the financial condition of the separate Sava entities is superior to that of the parent company, these factors are insufficient to wholly negate the rational relationship between the Government's stated purpose –conservation of Government resources – and achievement of that purpose by dismissing this case. The Court will not second-guess the Government's determination that additional recovery is "unlikely.''

The case cited by Relator, *United States v. Academy Mortgage Corp.*, No. 16-cv-02120, 2018 WL 3208157, at * 2-3 (N.D. Cal. Jun. 29, 2018), does not compel a different result. In *Academy Mortgage*, the Government moved to dismiss a *qui tam* action arguing that proceeding with the suit would be a waste of resources. The district court denied the motion on grounds that Government failed to conduct a "minimally adequate investigation" to determine the potential recovery in the action and that its justification for dismissal was, therefore, not rationally related to a valid Government purpose. *Id.* at * 3. As an initial matter, the Court respectfully disagrees

27

with the implication that the statute requires a definable minimum caliber investigation. Even so, the *Academy Mortgage* court found that the Government was unable to establish a rational relation between dismissal and conservation of resources because the government had made no effort to "assess the potential proceeds." Here, the Government's determination that the action is unlikely to provide additional recovery is not based on the value of the claims, but on the Defendants' financial condition.

With regard to the second part of the rational relation test, Relator has provided no evidence to suggest that the Government's decision to dismiss is fraudulent or illegal. While opinions may differ regarding the likelihood of recovery in this case, there is no evidence that the Government's assessment or it decision to dismiss this action is arbitrary and capricious.

Nor does the Court have concern that dismissal of this action violates Relator's due process rights. To the extent Relator has a protected property interest in this action, the requirements of procedural and substantive due process have been satisfied. As required by the statute, Relator has received notice of the Government's intent to dismiss this action and an opportunity to be heard, thus satisfying procedural due process. *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). As stated above, the *Sequoia Orange* rational relation test, which the Government has satisfied, is effectively the test for whether executive action comports with substantive due process.

The Court reaches the same result if considering the motion to dismiss under Federal Rule of Civil Procedure 41(a). Subject to applicable federal statutes, the Rule allows a plaintiff to dismiss an action without a court order by filing a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment. Fed. R. Civ. P. 41(a)(1)(A). If the opposing party has served an answer or a motion for summary judgment, "an action may be

28

dismissed at the plaintiff's request only by court order on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Unless the order states otherwise, Rule 41(a)(2) provides that the dismissal is without prejudice. *Id*. The primary purpose of requiring court approval is to "protect the nonmovant from unfair treatment." *Grover v. Eli Lilly and Co*., 33 F.3d 716, 718 (6th Cir. 1994).

Having found that dismissal is warranted under the terms of the applicable statute, the Court need only consider what terms are "proper." The Government seeks dismissal of all claims brought on behalf of the United States with prejudice as to Relator and without prejudice as to the United States. The Court finds that dismissal of all claims with prejudice as to Relator is not warranted under the facts of this case.

First, the Court has found that Relator's claim in Count IV is not subject to dismissal under the first-to-file, government action, and public disclosure bars. Second, and most importantly, the United States seeks dismissal largely based on the effect of a settlement agreement that is not yet finalized. Moreover, dismissing the surviving claim with prejudice as to Relator and without prejudice as to the United States, allows the Government to dismiss the claims on grounds that pursuit of these claims would be a waste of Government resources while preserving the Government right to pursue these claims without Relator at some point in the future. Such a result runs contrary to the purpose of the *qui tam* provisions of the FCA.

### III. CONCLUSION

For the reasons stated, the United States' motion to dismiss the amended complaint (Doc. No. 79) will be **GRANTED**. The claims in Counts I, II, III, and V will be dismissed **WITH PREJUDICE** as to Relator and **WITHOUT PREJUDICE** as to the United States; and the claim in Count IV will be dismissed **WITHOUT PREJUDICE** as to Relator and the United States.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

30